UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

MALIEK RAMSEY and RODNEY
MUSCHETTE,

                              Defendants.

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

15-CR-525 (ERK) (SMG)

KORMAN, *J.*:

On November 4, 2016, following a joint jury trial, Rodney Muschette and

Maliek Ramsey (together, the "Petitioners") were convicted for participating in the

retaliation murder of a federal cooperator—in violation of 18 U.S.C. § 1513. *See*

Trial Tr. 2018–2020. On March 9, 2020, Petitioners were sentenced to life

imprisonment. *See* ECF Nos. 198 & 200. Petitioners appealed their convictions,

which were affirmed by the Second Circuit. ECF Nos. 214 & 215. On March 27,

2023, Ramsey filed the instant motion seeking to vacate his conviction under 28

U.S.C. § 2255. *See* ECF No. 216. On April 21, 2023, Muschette submitted his own

motion to vacate under Section 2255, asking that his petition be consolidated with

Ramsey's and that his submissions be considered as supplements to the materials

filed by Ramsey. *See* ECF No. 224; Mischel Decl., ECF No. 224-2 ¶ 8. I agree that

for reasons of judicial efficiency and economy, Ramsey and Muschette's petitions

should be consolidated. I therefore consider the arguments and materials presented

1

by both Muschette and Ramsey together here.  *See United States v. Camacho*, Nos.,

1:14–CV–4846 (CSH), 1:14–CV–4628 (CSH), 2014 WL 3925275, at *1 (S.D.N.Y.

July 31, 2014) (consolidating two 28 U.S.C. § 2255 petitions where they involved

"significant common questions of law and fact.").

## BACKGROUND

I presume familiarity with the underlying facts in this matter, which were set

forth comprehensively in my order dated July 25, 2019.  *See* ECF No. 189.  I

nevertheless provide some background below—drawn from the evidence presented

at Muschette and Ramsey's trial—for context.

Petitioners were Brooklyn-based members of the "Eight Trey Crips" street

gang.  Trial Tr. 255, 264–65.  On December 30, 2008, Larry Pagett, the leader of the

Eight Trey Crips, made an open-court statement at his sentencing hearing stating

that he believed Nashwad Johnson to be a government cooperator.   GX 428(b), at

32–34[1]; Trial Tr. 254.  Immediately after the sentencing hearing, Pagett's sister

called Ramsey, who was living in London at the time.  Trial Tr. 909–10, 1131; GX

430.  A recorded call from later that day between Pagett and his sister reveals that

the sister and Ramsey discussed Johnson's cooperation, which Ramsey was upset to

learn about.  GX 221(a)-(b).  Following this, Ramsey called Muschette, who was in

Atlanta, and they spoke for ten minutes.  This was the first in a series of calls between

---

[1] The notation "GX" refers to the government's trial exhibits.

Ramsey and Muschette between December 30 and 31, 2008.  GX 255 & 256; Trial Tr. 834-35, 910, 915; *see also* GX 454 (matching users with telephone numbers). Ramsey also spoke for four minutes with Marlon Cole, a member of a different set of Crips called the "G Stone Crips."  *See* GX 255; Trial Tr. 340, 890, 895, 925; *see also* GX 454.

On January 4, 2009, Johnson was found dead on the side of a highway near Atlanta, Georgia.  Trial Tr. 734–75.  In November 2015, Muschette and Ramsey were indicted for retaliation murder of a government informant.  *See* ECF No. 1.  At trial, the Government's case relied on the testimony of Anthony Braithwaite, a member of the Eight Trey Crips who testified that he was involved in drug dealing and robberies with Muschette and Ramsey starting in September 2007.  Trial Tr. 219, 247, 249, 295, 297–301.

Braithwaite testified as follows:  On December 30, 2008, he drove down from Raleigh, North Carolina to Atlanta, Georgia with Muschette, Johnson, Terry Farley, and Derron Love.  Trial Tr. 318.  Love was a member of an unspecified Crip gang and Farley was not a member of a gang.  Trial Tr. 266, 326.  While in Atlanta, the group stayed in Farley's apartment.  Trial Tr. 338–39.  Cell site records introduced at trial confirmed that Muschette was at Farley's apartment around 11 PM on December 31, 2008.  GX 278, 406; Trial Tr. 338, 888–89.  On New Year's Eve, the group left in two separate cars—Muschette drove a car with Johnson in the passenger seat, while Farley drove a car with Braithwaite in the passenger seat and Love in the

3

back.  Trial Tr. 339–40.  After a few minutes, the group met up with Cole, who led the way in his own car as all three cars drove down the highway.  Trial Tr. 341–42. The three cars drove on the highway until Cole pulled over to the right, followed by Muschette and Johnson's car pulling up behind, and Farley, Braithwaite, and Love's car pulling up last.  Trial Tr. 342.  Braithwaite then saw Johnson run out of Muschette's car and jump over the highway guardrail before being shot at by Muschette.  Trial Tr. 343.  Cell site data indicates that at approximately 11:50 PM on December 31, 2008, Muschette was one mile from where Johnson's body was eventually discovered.  GX 279, 454; Trial Tr. 77, 893.

After Muschette fired his gun, Farley drove Braithwaite back to the apartment, where Braithwaite received a call from a member of the Eight Trey Crips named "Req" telling him that Johnson was dead.  Trial Tr. 266; 344–45.  A few minutes later, Braithwaite received a call from Muschette telling him that "[s]hit real in the field.  This is our year.  We ain't making no more mistakes."  Trial Tr. 345.  Though no recording of this call exists, cell records indicate that a call between Braithwaite and Muschette did occur shortly after midnight on January 1, 2009.  GX 256; GX 454.  About 20 minutes later, Muschette showed up at Farley's apartment.  Trial Tr. 346.

Shortly after the murder, Muschette and Braithwaite drove back to Raleigh. *Id.*  On the drive, Muschette explained to Braithwaite that he had seen court documents proving that Johnson cooperated against Pagett, and that Muschette had

4

killed Johnson to prevent him from cooperating against other members of the gang. Trial Tr. 346–47.  Muschette told Braithwaite that after firing at Johnson from behind as he ran from the car, Muschette chased him into the woods and "finished the job" by shooting Johnson from the front.  Trial Tr. 348.  This was consistent with the medical examiner's report, which found that Johnson's body had bullet entry wounds in the back and front.  Trial Tr. 103–109; GX 415(a).  Braithwaite also testified that when Ramsey visited him in prison in 2012, Ramsey told him that Johnson "had to [g]et pushed" and that Ramsey was "the one who ma[d]e sure it got done . . . the one that basically told [Cole] to make sure it [got] done."  Trial Tr. 355–56.

The Government also called Godfrey Grant—another member of the Eight Trey Crips—to testify that members of the Eight Trey Crips suspected Johnson was cooperating with law enforcement as early as 2006, but that there was some uncertainty.  Trial Tr. 633–59.

## PETITIONERS' CLAIMS

Muschette and Ramsey make three distinct arguments to support their petitions to vacate their sentences pursuant to 28 U.S.C. § 2255.  First, they allege that the Government committed a *Brady* violation by failing to disclose that Farley had made a statement to government investigators contradicting the prosecution's theory of the case put forward at trial.  Ramsey Opening Brief ("O.B."), ECF No. 216-1, at 8–10; Muschette O.B., ECF No. 224-3, at 5–7.  Second, Petitioners point

5

to newly discovered evidence—namely the potential testimony of Farley, Love, and Trai Watson—as testimony that would have resulted in a different verdict because it undermined Braithwaite's testimony.  *See* Joint Reply Br., ECF No. 232, at 10. Third, Petitioners argue that their trial counsel's performance was constitutionally deficient because counsel failed to investigate the scene of the crime or interview potential exculpatory witnesses.  *See* Muschette O.B. at 7–10.[2]

Kelley J. Sharkey, who represented only Ramsey at trial, but both Ramsey and Muschette pre-trial, *see* ECF Nos. 16, 21, prepared an affirmation outlining the investigations she oversaw to prepare the Petitioners' defense.  *See* Gov't Reply Br. Ex. A (the "Sharkey Affirmation"), ECF No. 226-1.  In relevant part, Ms. Sharkey affirms that an investigator working for the defense examined and photographed the crime scene and interviewed or attempted to contact relevant witnesses.  *See* Sharkey Affirmation ¶ 3–4.  Susan Gail Kellman, who represented Muschette at trial but not during the investigation phase, declined to provide an affirmation.  *See* ECF No. 59; Gov't Reply Br., ECF No. 226, at 4.

### LEGAL STANDARD

Under 28 U.S.C. § 2255, federal prisoners may move the sentencing court to vacate, set aside, or correct their sentence on the ground that such sentence was

---

[2] Muschette and Ramsey also initially argued that their trial counsel fell below the standard of representation required by the Sixth Amendment because counsel did not contest that venue was proper in the Eastern District of New York.  Petitioners have withdrawn this argument.  *See* Joint Reply Br. at 12.

"imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Because they seek to overturn a presumptively valid judgement, Muschette and Ramsey carry the burden of proving their claims by a preponderance of the evidence. *See Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000); *Harned v. Henderson*, 588 F.2d 12, 22 (2d Cir. 1978). Section 2255 further provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).

Denial of a petition without a hearing is proper where: "(1) the petition lacks meritorious allegations that can be established by competent evidence; (2) [] the case files and records conclusively demonstrate that the petitioner is not entitled to relief; or (3) [] the allegations of the petition, even if accepted as true, would not entitle the petitioner to relief." *Bishop v. United States*, No. 11-cv-5352 (DLI), 2015 WL 893560, at *8 (E.D.N.Y. Mar. 2, 2015) (citations and internal quotation marks omitted). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *United States v. Aiello,* 814 F.2d 109, 113–14 (2d Cir.1987). The Court need not credit factual assertions that are "contradicted by the record in the underlying proceeding"

7

and should make credibility determinations "based on all relevant circumstances." *Puglisi v. United States,* 586 F.3d 209, 214, 216 (2d Cir. 2009) (quoting *Cullen v. United States*, 194 F.3d 401, 407–08 (2d Cir. 1999)).  Moreover, in deciding whether an evidentiary hearing is required, the Court is entitled to rely upon submissions from the parties, including affidavits and documentary evidence.  *See Chang v. United States*, 250 F.3d 79, 85–86 (2d Cir. 2001).

Generally, claims that were not raised on direct appeal are barred from being raised in a Section 2255 petition absent a showing of cause and prejudice.  *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010).  However, this limitation does not apply to Section 2255 claims for ineffective assistance of counsel.  *See Massaro*, 538 U.S. at 509.  To satisfy the "cause" requirement, a Section 2255 petitioner must demonstrate that the issue was not raised on direct appeal due to circumstances "that cannot be fairly attributed to [that petitioner]."  *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993).  Prejudice is established by showing that the errors challenged in the Section 2255 petition "undermine[d] the integrity of the entire trial."  *See Rodriguez v. United States*, 866 F. Supp. 783, 785 (S.D.N.Y. 1994).

## DISCUSSION

### I.    Failure to Turn Over Brady Material

Petitioners first argue that the Government failed to turn over exculpatory and impeaching statements made by Terry Farley in a law enforcement interview

conducted prior to trial. *See* Joint Reply Br. at 1–2. Specifically, Farley told a detective that he was in Atlanta with Muschette on the night of the murder but never saw Braithwaite or Johnson in Atlanta. *See* Farley Tr., ECF No. 216-8, at 47–52, 59. Farley recorded this interview on his cell phone and Petitioners have attached a transcript of the recording to their petitions as well as an affidavit by Farley attesting to the veracity of the transcript. *See* Farley Tr.; Farley Aff. ¶ 13, ECF No. 216-6. Farley sent a letter to the Court after trial—but before Petitioners appealed—which was filed on the docket on August 29, 2019. *See* Farley Letter, ECF No. 192. In this letter, Farley outlined the contents of his law enforcement interview. *Id*. In Petitioners' view, had the defense been informed of Farley's interview and its contents, they could have called Farley as a witness to undermine Braithwaite's version of events. Joint Reply Br. at 9–10; Muschette O.B. at 5–7.

The Government argues that this claim is procedurally barred because it was not raised on direct appeal or that, in the alternative, Petitioners have not demonstrated they were prejudiced by this failure to turn over exculpatory evidence. Gov't Reply Br. at 9–11. In response, Petitioners explain that they could not have raised their *Brady* claim on direct appeal because Farley's letter was not part of the trial record and counsel did not have an opportunity to investigate this letter prior to appeal. *See* Joint Reply Br. at 4.

**a) Legal Standard**

9

In a criminal case, the government has a duty to disclose all exculpatory evidence to the defense upon request. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963). A *Brady* violation consists of three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching, (2) that evidence must have been suppressed by the government, either willfully or inadvertently, and (3) there must be a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A reasonable probability of a different result is one which "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

### b) Discussion

Setting aside Petitioners' failure to raise this *Brady* claim on direct appeal,[3] the contents of Farley's interview are insufficiently material to warrant Section 2255 relief. Had the Farley interview been disclosed to the defense prior to trial, it

---

[3] Petitioners' failure to raise their claims on direct appeal does not preclude me from bypassing the procedural default issue and instead deny their petitions on the merits. "The procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro*, 538 U.S. at 504.

arguably would have put Petitioners on notice that Farley denied seeing Johnson in Atlanta on the night of the murder and denied ever seeing Braithwaite in Atlanta. *See* Farley Tr. 52, 59.  Though disclosure of the interview's contents could have led the defense to call Farley at trial to impeach Braithwaite, there is no reasonable probability that this testimony would have led to a different verdict.  *See Turner v. United States*, 582 U.S. 313, 325–28 (2017) (holding that seven pieces of withheld evidence, when viewed in the context of the full record, did not create a reasonable probability of a different verdict).

When considering a federal habeas petition, courts should discount the impact of hypothetical impeachment testimony where it would have been cumulative or where the testimony of the witness sought to be impeached is corroborated by other evidence.  *See United States v. Payne*, 63 F.3d 1200, 1210 (2d. Cir. 1995).  While I do not think Farley's impeachment testimony would have been cumulative, it likely would not have been accorded much weight by a jury given Farley's obvious incentive to distance himself from the murder.  That Farley was driven by this incentive permeates the transcript of his interview and the letter he sent to the Court on August 27, 2019.  *See generally* Farley Tr.; Farley Letter.  It is likely the jury would have picked up on Farley's incentive to distance himself from the scene of the crime during his testimony.   In contrast to Farley's lack of credibility, several pieces of evidence introduced at trial corroborated Braithwaite's version of events.

11

As the Second Circuit pointed out in its October 29, 2021, opinion affirming this Court's denial of Petitioners' Rule 33 motion:

> Braithwaite's testimony was corroborated in several respects, including through [Petitioners'] and their co-conspirators' cell phone records around the time of the murder, cell phone location data showing Muschette in proximity to the murder scene, the medical examiner's testimony, testimony about the Eight Trey Crips gang from other gang members, and Muschette's false denial that he was in Atlanta on the day of the murder. Moreover, to the extent that [Petitioners] challenge Braithwaite's credibility, that issue, as well as [Petitioners'] argument that there was other information suggesting Johnson's cooperation prior to December 2008, was placed squarely before the jury.

*United States v. Ramsey*, Nos. 20-860, 20-877, 2021 WL 5022640, at *2 (2d Cir. Oct. 29, 2021). Viewing Farley's hypothetical testimony in this context, I cannot say that there is a reasonable likelihood it would have resulted in a different verdict.

Likewise, it is dubious that disclosure of Farley's interview would have materially altered defense counsel's chances of uncovering the newly discovered evidence Petitioners point to elsewhere in their briefs. According to Petitioners, the newly discovered statements of Watson, Farley, and Love could have been used to impeach Braithwaite, exculpate Petitioners, or even lead to the additional exculpatory witness Marlon Cole. *See* Ramsey O.B. at 20; Muschette O.B. at 6–7. However, as Petitioners themselves point out, the names of Watson, Farley, and Love were identified in discovery prior to trial. Ramsey O.B. at 19. Defense counsel were therefore on notice that these three individuals were potential sources of testimony that could contradict Braithwaite's version of events.

12

Petitioners have not identified anything in Farley's law enforcement interview that would have led defense counsel to seek out Watson, Love, or even Cole more than they already did.  *See* Joint Reply Br. at 7 (stating, without further explanation, that knowledge of Farley's statement would "have led inevitably to the very material evidence that was newly discovered during the post-trial investigation."); *see also Payne*, 63 F.3d at 1208 (burden is on the petitioner to establish the materiality of *Brady* material).  Though disclosure of the Farley interview is likely to have spurred the defense to seek him out more aggressively, his interview would not likely have resulted in a different verdict, even if he had been called at trial—as explained above.

To be clear, this is not a case where a *Brady* claim fails because Petitioners already knew the underlying facts permitting them to take advantage of the favorable evidence in the *Brady* material.  *See Hincapie v. City of New York*, 434 F. Supp. 3d 61, 76 (S.D.N.Y. 2020).  Rather, I am unconvinced that anything in the Farley interview would have pushed defense counsel to re-double their efforts to interview Watson, Love, or Cole—and Petitioners have not presented any arguments to the contrary.

In sum, the Farley interview was insufficiently material under *Brady* to warrant a new trial pursuant to 28 U.S.C. §2255.

## II.    Newly Discovered Evidence

Petitioners argue next that the sworn statements of Watson, Love, and Farley—which are attached to the petitions—constitute newly discovered evidence

13

requiring that Petitioners' convictions be vacated.[4]  *See* Ramsey O.B. at 12; Ramsey O.B. Exs. B, D, E, ECF Nos. 216-3, 216-5, 216-6; Joint Reply Br. 8–11.  These sworn statements indicate that a) Watson was with Braithwaite in Raleigh, not Atlanta, on the night of the murder; b) Love was not in Atlanta on the night of the murder and never went to Atlanta with Braithwaite; and c) Farley—though in Atlanta with Muschette on the night of the murder—never saw Braithwaite there. *See* Ramsey O.B. Exs. B–E, ECF Nos. 216-3, 216-5, 216-6.  Petitioners argue that because the Government's theory of the case was inconsistent with the ballistics and autopsy reports, this additional testimony contradicting the Government's narrative would have resulted in a different verdict.  *See* Joint Reply Br. at 11.

**a) Legal Standard**

At the outset, I note that courts in this Circuit have expressed doubts regarding whether the availability of new evidence can serve as an independent ground for relief under 28 U.S.C. § 2255.[5]  *See Peeples v. United States*, Nos. 17-CR-06032-FPG, 21-CV-06607-FPG, 2023 WL 195295, at *4 (W.D.N.Y. Jan. 17, 2023); *United States v. DeCarlo*, 848 F. Supp. 354, 356–57 (E.D.N.Y. 1994); *Conteh v. United*

---

[4] Petitioners retracted the argument made in their opening briefs that the affidavit by Damain Wiltshire, *see* Ramsey O.B. Ex. C, ECF No. 216-4, constituted newly discovered evidence because they concede he "was interviewed prior to trial." Joint Reply Br. at 8.

[5] Such claims are more commonly brought under Rule 33, even when other bases for vacating a petitioner's conviction are brought under 28 U.S.C. § 2255. *See, e.g.*, *United States v. Choudhry*, 330 F. Supp. 3d 815, 833–34 (E.D.N.Y. 2018), *aff'd*, 813 F. App'x 4 (2d Cir. 2020).

14

*States*, Nos. 03 Civ. 6019 (LAK), 98 CRIM. 0876 (LAK), 2003 WL 22127910, at *2 (S.D.N.Y. Sept. 16, 2003) ("Although our Court of Appeals on occasion has passed on newly discovered evidence claims under Section 2255, it is not clear that any availability of Section 2255 as a vehicle for such contentions survives *Herrera v. Collins* absent an independent constitutional violation." (footnotes omitted)).  This is particularly salient here, because although Petitioners identify the three affirmations as "newly discovered evidence," they do not explain how this evidence bears upon a violation of their constitutional rights, which is what Section 2255 is designed to remedy.  *See DeCarlo*, 848 F. Supp. at 357 ("Section 2255 is a substitute for habeas corpus and like it is confined to correcting errors that vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." (internal quotation marks omitted)) (quoting *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993)).

I need not resolve this issue because, even assuming that the availability of relief is governed by the Rule 33 standard (as both parties assume in their briefs), Petitioners would not be entitled to a new trial.  *See Peeples*, 2023 WL 195295, at *4 (disposing of a Section 2255 claim based on new evidence under the Rule 33 standard without ruling on whether newly discovered evidence suffices as an independent ground for relief under Section 2255).  For this same reason, I also decline to rule on the issue of whether Petitioners can raise their newly discovered evidence argument when they did not assert it on direct appeal.  *See Campino v.*

15

*United States*, 968 F.2d 187, 190 (2d Cir. 1992) ("[F]ailure to raise a constitutional issue on appeal is itself a procedural default, thereby implicating the cause and prejudice test."); *see also supra* note 3.

Because of society's interest in according finality to a jury's verdict, "a motion for a new trial based upon previously-undiscovered evidence is ordinarily 'not favored and should be granted only with great caution.'" *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975) (quoting *United States v. Costello*, 225 F. 2d 876, 876 (2d Cir. 1958)). Courts assessing whether newly discovered evidence justifies a new trial pursuant to 28 U.S.C. 2255 apply the same standard as used in Rule 33 motions based on newly discovered evidence. *See, e.g.*, *Harris v. United States*, 9 F. Supp. 2d 246, 253–55 (S.D.N.Y. 1998), *aff'd*, 216 F.3d 1072 (2d Cir. 2000). The standard for Rule 33 motions based on newly discovered evidence requires that: "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *Choudhry*, 330 F. Supp. 3d at 834 (internal quotation marks omitted) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)). For evidence to qualify as "newly discovered after trial," Petitioners must demonstrate that "such evidence was effectively undiscoverable at the time of trial." *United States v. Carpenter*, 520 F. Supp. 3d 290, 293 (E.D.N.Y.

16

2021).  Petitioners bear the burden of showing that each element of the Rule 33 standard is met.  *See United States v. Quinones*, 582 F. App'x 17, 18 (2d Cir. 2014).

**b) Discussion**

I cannot grant the relief Petitioners seek because they have not met their burden to demonstrate that the information in Watson, Love, and Farley's sworn statements "could not with due diligence have been discovered before or during trial."  *Choudhry*, 330 F. Supp. 3d at 838 (internal quotation marks omitted). Documents attached to the parties' briefs show that defense counsel knew about these three potential witnesses prior to trial and understood they were relevant. Sharkey's affirmation and the defense investigator's CJA voucher reveal that the investigator performed a skip trace on Farley and reviewed his social media. Sharkey Affirmation ¶ 4; Joint Reply Br., Ex A (the "CJA voucher"), ECF No. 232-1, at 3.   Likewise, Love was known to the defense as a potential source of information, since the defense attempted to locate him.  Sharkey Affimation ¶ 4. The CJA voucher also shows that Watson was interviewed by the defense investigator on October 15, 2016.[6]  *See* CJA voucher at 4.  Petitioners' briefs do not

---

[6] Petitioners contest that this interview ever occurred but have informed the Court that because the defense investigator has been diagnosed with dementia, a credibility hearing on this matter cannot be held.  Even if the CJA voucher were inaccurate, the burden is on Petitioners to demonstrate that Watson's testimony could not have been discovered before or during trial.  Nothing presented to this Court suggests that was the case.  *See* Watson Aff., ECF No. 216-3 ¶ 10 ("I was ready and willing to testify.").

17

even attempt to explain why the information in the affirmations of Watson, Love, and Farley was "effectively undiscoverable at the time of trial." *See Carpenter*, 520 F. Supp. 3d at 293.  This lack of explanation, particularly in the context of documents showing that the defense was aware of the significance of these three individuals, leads me to reject Petitioners' argument that the affirmations constitute newly discovered evidence. *See Choudhry*, 330 F. Supp. 3d at 838 (holding that proffered testimony by alibi witnesses was not newly discovered evidence where documents demonstrated the defense was aware of these witnesses).

Petitioners contend that the government cannot "have it both ways" by arguing that the newly discovered evidence was discoverable at the time of trial and also that defense counsel were not constitutionally defective for failing to uncover it. *See* Joint Reply Br. at 9 n.4.  I disagree.  Defense counsel's failure to investigate a lead does not fall below the required standard of attorney conduct simply because that lead is discoverable. *See Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) ("[W]hen there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'") (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)).

## III.   Ineffective Assistance of Counsel

Third and last, Petitioners argue that their defense counsel were ineffective because they failed to seek out and interview individuals who were identified as

members of the "murder convoy" in the Jencks Act material turned over by the Government.  Ramsey O.B. at 19; Muschette O.B. at 10.  Specifically, Petitioners assert that because the defense made no attempt to contact Farley, Love, Watson, or Cole prior to trial, their representation "fell below the standard of effectiveness required under the Sixth Amendment."[7]  Ramsey O.B. at 19–20.  In Petitioners' view, interviewing Farley and Love would have put the defense on notice that they could be called at trial to deny that they had ever been in Atlanta with Braithwaite. *See id.* at 19.  Likewise, interviewing Watson could have led to testimony that Watson and Braithwaite went to a club in Raleigh on the night of the murder. *Id.* at 20.  Petitioners argue that because the Government's case was already inconsistent with ballistics and autopsy reports, and because it relied so heavily on Braithwaite's testimony, calling these three witnesses at trial would have resulted in a different verdict. *See id.* at 21–23.  Petitioners do not explain why contacting Cole would have been helpful to the defense.  Muschette's petition also argues that the defense team was ineffective because it failed to investigate the scene of the crime. *See* Muschette O.B. at 10.

Ms. Sharkey's affirmation and a CJA voucher submitted for reimbursement of a defense investigator's services contradict Petitioners' assertions regarding their

---

[7] Because Petitioners' Joint Reply Brief concedes that "Wiltshire was interviewed prior to trial and thus is not a newly discovered witness," Joint Reply Br. at 8, I do not address the argument made in Petitioners' opening briefs that failure to interview Wilshire constituted ineffective assistance of counsel.

counsel's failure to investigate. These documents reflect that the investigator interviewed Watson, went to Brooklyn searching for Love, and performed a skip trace on Farley. *See* Sharkey Affirmation ¶ 4, CJA voucher at 2–4. The defense investigator also traveled to Atlanta to examine and photograph the crime scene. Sharkey Affirmation ¶ 3; CJA voucher at 3. Additionally, the investigator interviewed a variety of potential witnesses—though the defense ultimately decided not to call any of them at trial. *See* CJA voucher at 2–4.

Petitioners contend that the CJA voucher is "unreliable hearsay." Joint Reply Br. at 15–16. While the CJA voucher may be hearsay, it would nonetheless be admissible at an evidentiary hearing under Federal Rule of Evidence 807. *See, e.g.*, *Lopez v. Miller*, 915 F. Supp. 2d 373, 423–24 (E.D.N.Y. 2013).

Under Rule 807's exception to hearsay, an out-of-court statement offered for its truth may be admitted into evidence when "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; (4) admitting it will best serve the purposes of these rules and the interests of justice; and (5) the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars." *Id.* (internal quotation marks omitted).

The CJA voucher meets these five requirements. First, the CJA voucher, being a quasi-contemporaneous, detailed record of the investigation that was

20

submitted to the Court, has sufficient circumstantial guarantees of trustworthiness. Second, the voucher would be offered as evidence of what investigations were undertaken by the defense—a material fact in this context. Third, because the defense investigator suffers from dementia and is unavailable to testify, *see* Joint Reply Br. at 14, the voucher is more probative than any other evidence that could be obtained through reasonable efforts. Fourth, it is in the interests of justice for the Court to be able to consider the CJA voucher since it is a trustworthy source which sheds light on the scope of the investigations undertaken by defense counsel. *See In re Drake*, 786 F. Supp. 229, 234 (E.D.N.Y. 1992) (explaining that the "interests of justice" factor essentially collapses into the trustworthiness inquiry). Fifth, if an evidentiary hearing were held, the Government would presumably give Petitioners notice of its intent to offer the CJA voucher. I therefore hold that the CJA voucher would be admissible at an evidentiary hearing and can thus be considered at this stage.

### a) Legal Standard

Unlike Petitioners' other claims, "[f]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro*, 538 U.S. at 509. To support a claim for ineffective assistance of counsel, Petitioners must demonstrate that their counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that "there is a reasonable probability that, but for

21

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). Petitioners bear the burden of overcoming the presumption that challenged actions by their counsel were sound trial strategy. *See id.* at 689. Reasonable efforts to locate potentially exculpatory witnesses generally fall within the objective standard of conduct for attorneys, even when that witness is not located and called at trial. *See, e.g., Samuels v. Bennett*, No. 03 Civ. 2340 (BSJ) (FM), 2009 WL 2516850, at \*21–22 (S.D.N.Y. Aug. 17, 2009). It may also be sound strategy not to investigate a particular lead. *See Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003); *Strickland*, 466 U.S. at 690 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). This is particularly true when defense counsel has reason to believe that a lead will not contribute to their planned trial strategy, as is the case when a potential lead is unlikely to be a useful trial witness. *See Kone v. United States*, Nos. S2 05-CR-102-01 (KMK), 10-CV-2424 (KMK), 2012 WL 13171348, at \*4–5 (S.D.N.Y. Jan. 26, 2012).

Thus, Petitioners' defense counsel were not required "to conduct a comprehensive investigation of every possible lead or defense." *United States v. Caracappa*, 614 F.3d 30, 47 (2d Cir. 2010) (internal quotation marks omitted) (quoting *United States v. Eppolito*, 436 F. Supp. 2d 532, 562 (E.D.N.Y. 2006), *rev'd on other grounds*, 543 F.3d 25 (2d Cir. 2008)). Rather, to obtain relief under Section

22

2255, Petitioners bear the burden of showing that their counsel's investigative efforts fell below "an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688; *see also, e.g.*, *Schulz v. Marshal*, 345 F. App'x 627, 629 (2d Cir. 2009) (concluding, in a case with no physical evidence, that the New York Court of Appeals unreasonably applied *Strickland* by holding that trial counsel's failure to interview one of two eyewitnesses to a crime was not deficient). To obtain an evidentiary hearing based on ineffective assistance of counsel, Petitioners need only establish that they have a "plausible" claim, not that they "will necessarily succeed on the claim." *Puglisi*, 586 F.3d at 213 (internal quotation marks and citation omitted).

### b) Discussion

Here, defense counsel acted reasonably in seeking out Watson, Love, and Farley but allocating investigative resources elsewhere when they could not find Love or Farley. Indeed, as Ms. Sharkey's affidavit and the CJA voucher reveal, the defense investigator interviewed a wide variety of potentially exculpatory witnesses—including Watson—and examined the crime scene in Atlanta. Sharkey Affirmation ¶¶ 3–4; CJA voucher at 3. Even if I credit Petitioners' assertion that Watson was never interviewed, the CJA voucher shows that, at a minimum, the defense attempted to locate him. *See* CJA voucher at 3.

This is not a case where defense counsel neglected to perform *any* investigation into possible leads that could exonerate Petitioners. *See, e.g.*, *Pavel v.*

23

*Hollins*, 261 F.3d 210, 221 (2d Cir. 2001).  Rather, this is a case—like virtually all criminal cases—where defense counsel made the reasonable decision to prioritize certain investigative leads over others.  *See, e.g.*, *Kone*, 2012 WL 13171348, at *5; *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005).

It may also have been a tactical choice not to interview witnesses who, if called at trial, could have further tied Ramsey and Muschette to gang activity and had an obvious incentive to distance themselves from Johnson's death.  After all, Braithwaite testified that Love was a member of an unspecified Crip gang and that Marlon Cole was a member of a different Crip "set."  Trial Tr. 264–66; 335.  The defense strategy at trial was to poke holes in the Government's case rather than put on an affirmative case regarding Muschette's whereabouts on the night of the murder.  *See* Muschette O.B. at 9 ("The defense at trial, pursued aggressively, was that the government's main witnesses . . . were credibility challenged, street-wise criminals and liars, who were 'playing the system.'").  It was a reasonable strategic decision for defense counsel not to expend effort on locating and interviewing individuals who did not fit into this strategy.

As for defense counsel's failure to interview Cole, Petitioners have not met their burden to show why this was unreasonable or how this prejudiced them.  Nothing presently before the court lays out how Cole would have testified.  *See* Ramsey O.B. at 19 (stating, without further support, that contacting Marlon Cole would have provided the defense with a "witness[] to contradict the Government's

24

circumstantial case."). Such a vague and conclusory claim does not merit habeas relief. *See Wood v. Artus*, No. 15-CV-4602 (SJF), 2020 WL 3256848, at *9 (E.D.N.Y. June 15, 2020).

Lastly, the argument that defense counsel were ineffective because they did not investigate the scene of the crime is plainly contradicted by Sharkey's affidavit and the quasi-contemporaneous CJA voucher. *See* Sharkey Affirmation ¶ 3; CJA voucher at 3. Both the affirmation and voucher reflect that prior to trial, the defense investigator traveled to Atlanta to examine and photograph the crime scene, concluding that the Government's theory of the case was physically possible. Sharkey Affirmation ¶ 3; CJA voucher at 3. Petitioners are mistaken that defense counsel's statements at trial demonstrate that no analysis of the route travelled by Muschette was ever done. *See* Joint Reply Br. at 15. The sidebar cited by Petitioners reveals only that defense counsel contested that Braithwaite could testify based on photographs of the crime scene offered by the government—not that they themselves had received no analysis of the crime scene. Trial Tr. 1138–40. Likewise, Kellman's offer to "go to Atlanta tonight and go to the slopes and take pictures" of the crime scene, *see* Trial Tr. 1162–63, is not an admission that there was no investigation of the crime scene. I therefore cannot presume the credibility of factual assertions made by Petitioners because "the assertions are contradicted by the record in the underlying proceeding." *Puglisi*, 586 F.3d at 214.

25

Unlike their contention that Watson was never interviewed, which is at least supported by Watson's affidavit,[8] Petitioners' contention that the crime scene was never investigated is conclusory.  I am not required to grant an evidentiary hearing where, as here, the factual contentions advanced by Petitioners are "vague, conclusory, or palpably incredible."  *Gonzalez v. United States*, 722 F.3d 118, 130–31 (2d Cir. 2013) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)) (internal quotation marks omitted).  As with all their other claims then, I have sufficient information to deny Petitioners' ineffective assistance of counsel claims without an evidentiary hearing.

In sum, because defense counsel made a reasonable effort to locate and interview Watson, Love, and Farley; because deciding to prioritize other leads was a reasonable strategic decision; and because the Atlanta crime scene was in fact investigated, I deny Petitioners' Section 2255 claim based on ineffective assistance of counsel.

**CONCLUSION**

Based on the motions, files, and records presently before me, an evidentiary hearing to determine whether Petitioners are entitled to relief is not warranted.  *See*

---

[8] Though there is a factual dispute as to whether Watson was interviewed, even assuming he was not interviewed, counsel were not ineffective for the reasons explained above.  Thus, an evidentiary hearing is not required on this issue for the separate reason that the motions, files, and records presently before me are sufficient to determine whether Section 2255 relief should be granted.

*Saar v. United States*, No. 87 Civ. 6956 (KC), 1988 WL 64795, at *9 (S.D.N.Y. June 9, 1988), *aff'd*, 872 F.2d 1022 (2d Cir. 1989).  Mr. Muschette and Mr. Ramsey's Petitions under 28 U.S.C. § 2255 are DENIED.  I also decline to issue a certificate of appealability because Petitioners have not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see, e.g.*, *Quezada v. Nichols*, No. 04 Civ. 2765 (RJH) (RLE), 2008 WL 818566, at *1 (S.D.N.Y. Mar. 26, 2008).

**SO ORDERED.**

Brooklyn, New York
April 22, 2026

/s/ Edward R. Korman
Edward R. Korman
United States District Judge